# DECIDED

# COT ٬T OF APPEALS

# STATE OF NEW YORK.

---

### DE PEYSTER v. MICHAEL.

*Tenures.—Restraints on alienation.—Quarter-sales.*

The acts of 1779 and 1789 abolished all feudal tenures between private citizens; the seignory of all lands is now in the People of the State.

All restraints upon alienation, contained in leases in fee, reserving rent, are void, as repugnant to the estate granted; the right of re-entry for non-payment of rent, or non-performance of other conditions, is not a reversion or possibility of reversion in the grantor, but a mere right of action; consequently, a reservation of quarter-sales, and of re-entry for their non-payment, is illegal and void.

Overbagh v. Patrie, 8 Barb. 28, affirmed.

*APPEAL from the general term of the Supreme Court, in the third district, where a judgment entered upon a verdict in favor of the defendant, had been affirmed. [ * 468

This was an ejectment by John Watts De Peyster against Anthony Michael to recover possession of about one hundred acres of land in the town of Claverack, Columbia county, which the plaintiff claimed in fee. The defendant pleaded the general issue.

441

On the 23d November 1785, James Van Rensselaer leased to William P. Snyder in fee, the lands in question, with others, reserving an annual rent of forty-eight bushels of wheat. *The lease also contained the following provisions: "And the said lessor, for himself, his heirs, executors, administrators and assigns, doth also save and reserve the one equal fourth part of all moneys arising, or that may arise, by or from the selling, renting, setting-over, assigning, or anyhow disposing of the premises hereby leased, or any part or parcel thereof, by the said lessee, his heirs, executors, administrators and assigns; and when, and as often, and every time, the same shall be so sold, rented, set-over, assigned or otherwise disposed of: And the said lessee, for himself, his heirs, executors, administrators and assigns, doth also covenant, promise, grant and agree, that whenever he, or they, shall incline, or be by law otherwise obliged, to sell, rent, set-over, assign or otherwise dispose of his, or their, interest in the premises, or any part or parcel thereof, that then, and in that case, he, or they, or some one of them, shall make the first offer thereof unto the lessor, his heirs, executors, administrators or assigns: notifying and declaring in writing what he or they will take for the same; and if the said lessor his heirs, executors, administrators or assigns, do not take it, at the price required for the same, after deducting therefrom the one equal fourth part as above reserved, together with any arrears of rent which may then be due, then he, or they, shall, within twenty-one days from the time of such notice being actually so given, and on further application of the said lessee, his heirs, executors, administrators or assigns, grant or permit to him, or them, to sell, assign or rent his, or their, interest in the premises: Provided, always, that every sale, renting or otherwise disposing *of the premises, or any part or parcel thereof, shall be void and to all intents and purposes of non-effect,

*469 ]

*470 ]

442

and the premises revert to the lessor, his heirs, executors, administrators or assigns, such permit, or anything herein contained notwithstanding, unless the seller or purchaser shall well and truly pay unto the said lessor, his heirs, executors, administrators or assigns, the one equal fourth part of the money it shall so be offered for as aforesaid." There was also a clause of re-entry for breach of any of the covenants and conditions.

The plaintiff had, by mesne conveyances, succeeded to all the rights of the lessor in the premises; and the defendant, in like manner, had become possessed of the estate of the original lessee. It was not claimed, that there had been any observance of the conditions of the lease, with respect to the payment of quarter-sales.

On the trial of the cause, before PARKER, J., the defendant, on the close of the evidence, moved for a non-suit, on the ground, *inter alia,* that the clause in the lease reserving the payment of quarter-sales on alienation was void, as, being, in substance, a fine on alienation, as repugnant to the grant, and as against public policy. The learned judge held, that the covenant and condition were void, and directed a verdict for the defendant; to which an exception was taken. And the judgment entered on the verdict having been affirmed at general term, the plaintiff took this appeal.

*Sutherland,* for the appellant.

*Hogeboom,* for the respondent.

*RUGGLES, C. J.—This was an action of ejectment brought to recover land, on the [ *489 ground of a breach of the condition to pay quarter-sale moneys.

The conveyance out of which the controversy arises is a lease in fee from James Van Rensselaer, of Albany, to

William P. Snyder, of Claverack, dated 23d November 1785. The plaintiff, De Peyster, is the assignee of the lessor, and the defendant is the assignee of the lessee. The rent reserved in the lease was forty-eight bushels of wheat. The lessor, for himself, his heirs and assigns, also saved and reserved the one equal fourth part of all the moneys owing, or that might arise, by or from the selling, renting, setting-over, assigning, or any how disposing of the premises leased, or any part or parcel thereof, by the said lessee, his heirs, executors, administrators and assigns, and when, and as often, and every time, the same shall be sold, rented, set-over, assigned or otherwise disposed of. The lessee covenanted, for himself, his heirs, executors, administrators and assigns, that whenever he, or they, should be inclined to sell the premises, or any part thereof, he, or they, should make the first offer to the plaintiff, in writing. If the lessor should not take it, at the price required, after deducting one-fourth thereof, and all arrears of rent, the lessor covenanted to grant or permit the lessee, or his representatives, to sell or assign the premises; provided, however, that such sale or assignment should be void, and the premises should revert to the lessor, his heirs, &c., unless the seller or the purchaser should pay the lessor, his heirs, &c., one-fourth part of the purchase-money it should be offered for. The lease was declared therein to be given upon the express condition, that if the rent should be in arrear for forty days, or if the lessee, his heirs or assigns, &c., should not perform and keep all *the other covenants and conditions on his or their part to be kept and performed, then that the lessor, his heirs, &c., might re-enter upon the premises, and repossess and enjoy the same as of his former estate.

\* 490 ]

The plaintiff proved, on the trial, or gave evidence tending to show, that a portion of the premises contained in the lease had been sold or assigned to the

defendant, without paying to the assignee of the lessor a quarter of the sale-money, according to the covenant of the lessee. The defendant insisted, that the condition to pay the quarter-sales, as they are commonly called, was repugnant to the estate in fee granted by the lease, and was, therefore, void. The judge, at the circuit, decided the condition to be void, and nonsuited the plaintiff; the plaintiff excepted to the decision; the supreme court, at the general term, affirmed the decision at the circuit, and rendered judgment for the defendant. The plaintiff appeals to this court, and the sole question presented on the argument is, whether the condition in the lease to pay the quarter-sales is valid or void.

Until the adoption of the constitution of 1846, conditions of this nature, in leases for years, for lives and in fee, have not been unusual. These conditions, in leases for years and for lives, have been repeatedly upheld in this state, as valid, although in restraint of alienation. But their validity in grants or leases in fee has been drawn in question, in the supreme court, only in one case—that of *Jackson* v. *Schutz* (18 Johns. 174). That was an action of ejectment to recover for condition broken; there were two conditions in the lease; one, that the lessor should have the right of pre-emption, in case of a sale by the lessee; and the other, that one-tenth of the sale-money should be paid to the lessor; both conditions had been broken. There was a verdict for the plaintiff. Mr. Justice Platt, who delivered the opinion, held, that the condition to pay the tenth of the sale-money was valid, and that the plaintiff, for that reason, was entitled to judgment. Chief Justice Spencer was of opinion, that the plaintiff was entitled to judgment, on the ground that the condition giving *the lessor a right of pre-emption was lawful, and had been broken; [ * 491 on the other point, he expressed no opinion. That the plaintiff, in that case, was entitled to recover on the breach of the condition in relation to pre-emption was

445

not questioned, and it seems to be entirely clear. The case states distinctly that the lessee assigned the lease, without license from the lessors, and without offering the refusal to them. The decision of the other point, in relation to the tenth of the sale-money, was unnecessary, and it may well be, that it passed with little or no examination by any member of the court, excepting Mr. Justice PLATT. It would, therefore, be doing great wrong to other parties interested, at that time or since, in the same question, to regard it as settled by the judgment in that case. That judgment never was reviewed in the court for the correction of errors; the defendant had no inducement to go there with it; because it must necessarily have been decided against him in that court, on the point noticed by Chief Justice SPENCER. If, therefore, on a careful examination of the decision of the supreme court in the case of *Jackson* v. *Schutz*, on the point now in controversy, it should be found to be erroneous, it ought not to be adhered to as a rule of property; and, especially so, in regard to the lease in question, which was made long before that decision was pronounced.

In estates for lives or years, conditions in restraint of alienation are lawful; the books are full of cases in which they have been sanctioned in England. (Platt on Covenants 404.) In this state, conditions in leases for lives and years, to pay to the lessor a portion of the sale-moneys have been repeatedly recognised as valid. (7 Johns. 531; 15 Id. 277; 7 Cowen 285; 3 Wend. 230; 7 Hill 253.) The foundation of the power of the lessor to restrain alienation, in those cases, rests exclusively upon his ownership of the reversion; this appears by Brooke's Abrigement, Condition, 57 *a.* "If a man have lands for a term of years, on condition that he shall not grant over his estate, this is good, *by reason of a reversion remaining in the lessor.* The contrary, of a feoffment on *490 such condition, or that the feoffee *shall not commit waste, for no right or interest remains in

the feoffor." And according to the Touchstone (p. 130, Preston's ed., Law Library, vol. 30)—"If a gift had been made to an abbot and his successor, on condition not to alien, this had been a good condition on account of the reversionary right of the grantor, since he will be entitled to the land by way of reverter, on the dissolution of the corporation. Even on a grant in fee to a corporation, and though the corporation may, unless restrained by condition, alien the fee-simple, yet, on the dissolution of the corporation, while owner, the reverter would be to the grantor or his heirs, instead of there being an escheat to the lord of the seignory."

These references are sufficient to show, that the owner of the reversion, or possibility of reverter only, can restrain the alienation by his grantee in fee; and we have been referred to no case, and can find none, showing that any other interest whatever in the grantee will enable him to impose such restraint. We speak of the law as it stood previous to the constitution of 1846, which forbids the reservation of quarter-sales and the like.

But it is a well-established principle, that where an estate in fee-simple is granted, a condition that the grantee shall not alien the land, is void. Littleton says, "Also, if a feoffment be made on this condition, that the the feoffee shall not alien the land to any, this condition is void; because, when a man is enfeoffed of lands or tenements, he hath the power to alien them to any person by law. For, if such a condition should be good, then the condition should oust him of all the power which the law gives him, which should be against reason, and, therefore, such a condition is void." (§ 360.)

Coke, in his commentary on this section, adds, "And the like law is of a devise in fee, upon a condition that the devisee shall not alien, the condition is void; and so it is of a grant, release, confirmation, or any other conveyance whereby a fee-simple doth pass." (Co. Litt.

223 *a.*) The language of Mr. Cruise is, "A condition annexed to the creation of an estate in fee-simple, that the tenant shall not alien, is void and repugnant to the *nature of the estate given; for a power of alienation is an incident *inseparably annexed* to an estate in fee-simple." (Cruise Dig., tit. 13, c. 1, § 22.) The right of alienation passes by the grant of the fee, as perfectly as if it were given by the express terms of the grant; without such right, the estate granted would be neither a fee-simple, nor any other estate known to the law.   Lands granted in fee, on condition that the grantee shall not enjoy the lands, or shall not take the profits of the lands; or on condition that the heir of the grantee shall not inherit the lands; or, on condition that the grantee shall not do waste, or, on condition that his wife shall not be endowed, in all these and the like cases, the condition is void, as repugnant to the estate. (Shep. Touchstone 131.)  "A condition annexed to an estate given, is a divided clause from the grant, and, therefore, cannot frustrate the grant precedent, neither in anything expressed, nor in anything implied, which is of its nature incident and inseparable from the thing granted." (Hobart 170.)[1]

The reason why such a condition cannot be made good, by agreement or consent of parties, is, that a fee-simple estate and a restraint upon its alienation cannot in their nature co-exist.   The ownership of the fee cannot exist in one person, while the ownership of the right of alienation and of its fruits, exists in a different person; this is a principle older than the common law of England.  Grotius (Book 1, c. 6, § 1) says, "Since the establishment of property, men, who are masters of their own goods, have, by the law of nature, the power of disposing of, or of transferring, all or any part of their

---

[1] A testator cannot annex to a devise in fee, a condition restricting the general power of alienation.  Reifsnyder *v.* Hunter, **19** Penn. St. 41 ; Walker *v.* Vincent, Ibid. 369.

effects, to other persons; for this is the very nature of property; I mean, of full and complete property; and, therefore, Aristotle says, 'It is the definition of property, to have in one's self the power of alienation.'"

That this principle was, at an early day, engrafted upon the common law, and applied to estates in fee, we have the authority of Littleton, as above cited, and of Coke (2 Inst. 65). "By the common law, it is against the nature and purity of a fee-simple, *for the tenants to be restrained from alienation." But [ * 494 the rule of common law, on this point, is not founded exclusively on principles of natural law; it rests also on grounds of great public utility and convenience; in facilitating the exchange of property; in simplifying its ownership; and in freeing it from embarrassments, which are injurious not only to its possessor, but to the public at large.

But it is said, that the condition that the grantee shall pay one-fourth of the sale-money, whenever he sells the land, is not repugnant to the estate, because it is not an absolute and entire restraint and prohibition; and that the grantee may make a valid conveyance of his land, upon paying the grantor a part of the price. Let us examine this proposition, upon reason and upon authority.

If the continuance of the estate can be made to depend on the payment of a tenth, or a sixth, or a fourth part of the value of the land at every sale, it may be made to depend on the payment of nine-tenths, or the whole of the sale-money. It is impossible, on any known principle, to say, that a condition to pay a quarter of the sale-money is valid, and a condition to pay the half, or any greater proportion, would be void; if we affirm the validity of a condition to pay a quarter, we must affirm a condition to pay any greater amount. It would be a bold assertion, to say that the adoption of such a principle would not operate as a fatal restraint upon aliena-

tion; that which cannot be done by a direct prohibition, cannot be done indirectly. The enforcement of the restraint upon alienation, by requiring money to be paid for the privilege, and by a forfeiture, in case of nonpayment, separates the incident of free alienation from the estate in fee, as effectually as a direct prohibition. The principle of natural right, the rule of the common law, and the reasons of public policy, which forbid restraints upon the disposition of one's own property, are as effectually overthrown by the one, as by the other.

The indefatigable research of the counsel for the plaintiff has not furnished us with a single case, or a single authority, from *the elementary writers in England, in favor of the validity of such a condition in the grant of a fee-simple estate, or in the grant of a fee-farm lease. There are cases, where conditions not to sell, or to assign to a particular person, or for a particular time, have been held good, but some of them are of doubtful authority; and they all differ from the case in controversy, in this, that the condition does not appear on its face to impair the value of the lands in the hands of the grantee, and they take away from him no part of the fruits of the sale, when made in conformity with the grant.[2]

There is, however, abundant authority to show that conditions that the grantee shall not alien, without paying a sum of money therefor, are unlawful restraints on alienation, and, therefore, void. In Mr. Preston's edition of Sheppard's Touchstone, p. 130, it is laid down, that "if the condition of a feoffment or grant be that the feoffee or grantee shall not alien the thing granted to any person whatever; or that, if he do alien to any person, he shall pay a fine to the feoffor, those and the like conditions are void, in the case of a common person, as repugnant to the estate," (to which the editor adds, by

[2] McCullough *v.* Gilmore, 11 Penn. St. 370; Tanner *v.* Fowler, 10 Watts 325.

way of explanation of the text) "since the condition takes away one of the incidents of ownership, namely, the right of alienation, which the law encourages."

That the word "fine" was used by the author of the Touchstone, and by Lord Coke, to denote a sum of money agreed to be paid on alienation, and not a penalty imposed by any court, can admit of no doubt. In the former sense, it is used, not only in the older, but in the modern books. (Lilly's Conveyancer 624.) Jacob, in his Law Dictionary, says, the premiums given on renewal of leases are termed fines, and there are fines for alienation of copyholds paid to the lord. (Vol. 3, p. 72, ed. of 1811.) One of the definitions of the same word given by Mr. Burrill, is, "a sum of money or price paid for obtaining a benefit, favor or privilege, as the ancient fines for obtaining a writ, and for alienation."

That a condition requiring a devisee to pay a sum of money upon aliening the estate, is void, was expressly decided in the *case of *King* v. *Burchell,* by Lord Keeper HENLEY (Ambler 379). The case was [ * 496 shortly this: John Blunt devised lands in fee-tail to his cousin, John Harris, remainder to William King and his heirs for ever; with a proviso "that the bequests and limitations of all the premises limited to his cousin, John Harris, and his issue, male and female, is, upon this special consideration, that if John Harris, or his issue, or any of them, shall alienate, mortgage or incumber, or commit any act or deed whereby to alter, change, charge or defeat the bequests, he or they should pay or cause to be paid, and he did thereby charge the premises with 2000*l.* unto such person or persons, his or their heirs, who should or ought to take next, by virtue or means of any of the bequests or limitations." In favor of the validity of the condition, it was argued, that it was not the case of a restraint, but of an alternative; that is, if you bar the entail, you shall pay. On the other side, it was insisted, that the proviso was against

law; that it was to restrain what was incident to an estate-tail, and therefore void. Henley, Lord Keeper (afterwards Lord Chancellor Northington), took time to consider, and on the 20th of November 1759, delivered his opinion, that John Harris took an estate-tail, *and that the proviso was repugnant to the estate.* This must be regarded as a direct adjudication on the point now immediately under consideration; because, if the condition to pay a sum of money, upon the alienation of an entailed estate, be repugnant to the estate, for the reason that it prevents or restrains alienation, it must be so, *à fortiori,* in any other estate of inheritance.

In addition, the language of Nelson, C. J., in *Livingston* v. *Stickles* (7 Hill 257), may be referred to; where he says, the direct tendency of the covenant to pay tenth sales was, to restrain alienation; and that these tenth sales are, in the nature of the ancient fines upon alienation, incident to military tenures, and for aught he could see, clog the transmission of property from hand to hand, as heavily as those ancient feudal burdens long ago abolished. *Upon the highest authority, therefore, it may be affirmed, that in a fee-simple grant of land, a condition that the grantee shall not alien, or that he shall pay a sum of money to the grantor, upon alienation, is void, on the ground that it is repugnant to the estate granted.

The lease on which this action is brought created an estate of inheritance in the grantee, his heirs and assigns. It is a fee-simple estate, subject only to the payment of the rents reserved, and to the performance of the lawful conditions contained therein; it is what was anciently called a fee-farm estate. A fee-farm rent is a rent-charge, issuing out of an estate in fee; a grant of lands in fee, reserving rent, is only letting lands to farm *in fee-simple,* instead of the usual methods for life or years. (2 Bl. Com. 43; Hargrave's Notes 143 *b,* note 5.) A fee-farm rent is a perpetual rent, reserved on a

conveyance *in fee-simple*. (3 Cruise 284.) Fee-farms are lands held in fee, to render for them annually the true value, or more or less, and is called a fee-farm, because a farm-rent is reserved, upon a grant in fee. (2 Inst. 44.) It is expressly said in the statute of *quia emptores*, that it extends only to lands holden in fee-simple. (1 Evans's Stat. 195.) Sir Edward Coke declares, that it extends to lands held in fee-farm. (2 Inst. 502.) These references are made for the purpose of showing that the estates created by leases like the present, are estates of inherit-ance; that they are classed among estates in fee-simple; that no reversionary interest remains in the lessor; and they are, therefore, subject to the operation of the legal principles which forbid restraints upon alienation, in all cases where no feudal relation exists between the grantor and grantee.

Restraints upon alienation of lands held in fee-simple, were of feudal origin. A feoffment in fee did not origin-ally pass an estate, in the sense in which we now under-stand it; the purchaser took only an usufructuary interest, without the power of alienation, in prejudice of the heir, or of the lord. In default of heirs, the ten-ure became extinct, and the land reverted to the lord. The heir took by purchase, and independent of the ancestor, *who could not alien, nor could the lord alien the seignory, without the consent of [ * 498 the tenant. This restraint on alienation was a violent and unnatural state of things, contrary to the nature and value of property, and the inherent and universal love of independence. It arose partly from favor to the heir, and partly from favor to the lord, and the genius of the feudal system was originally so strong in favor of restraint upon alienation, that by a general ordinance, mentioned in the Book of Fiefs, the hand of him who wrote a deed of alienation was directed to be struck off. (3 Kent's Com. 506.) The same learned commentator proceeds to give an outline of the various causes which

gradually led to the mitigation of these severe restrictions, until they were finally removed (except as to the king's tenants *in capite*) by the statute of *quia emptores terrarum*.

It will be necessary to refer briefly to the English feudal tenures, for the purpose of ascertaining the mode and process by which restraints upon alienation in fee were abolished in that country; and then to show, that similar changes have taken place, at a later period, in the law of this state.

All the land in the kingdom is supposed, says Blackstone, to be holden mediately or immediately of the king, who is styled the lord paramount, or above all. Such tenants as held under the king, immediately, when they granted out portions of their lands to inferior persons, became also lords with respect to those inferior persons, as they were still tenants with respect to the king, and thus partaking of a middle nature were called *mesne* or middle lords. So that, if the king granted a manor to A., and he granted a portion of the land to B., now B. was said to hold of A., and A. of the king; or, in other words, B. held his lands immediately of A., but mediately of the king. The king, therefore, was styled lord paramount; A. was both tenant and lord, or was a mesne lord, and B. was called tenant paravail, or the lowest tenant, being he who was supposed to make avail or profit of the land. (2 Bl. Com. 59.)

Out of these feudal tenures or holdings sprung certain rights and incidents, among which were *fealty* and *escheat;* both *these were incidents of socage *499 ] tenure, of which alone it is necessary to speak. Fealty was the obligation of fidelity, which the tenant owed to his lord; escheat was the reversion of the estate on a grant in fee-simple, upon a failure of the heirs of the owner. Fealty was annexed to, and attendant on, the reversion; they were inseparable. These incidents of feudal tenure belonged to the lord of whom the lands

were immediately holden; that is to say, to him of whom the owner for the time being purchased. These grants were called subinfeudations, because they created new feudal relations between the grantor and grantee. Each grantor, as the feudal lord of his grantee, was entitled to require his grantee to take the oath of fealty to him, and in case of the death of his grantee, while the owner of the land, without heirs, the grantor was entitled to the reversion or escheat.

Title by escheat in the English law, says Kent (4 Com. 423), was one of the fruits and consequences of feudal tenure; when the blood of the last person seised became extinct, and the title of the tenant in fee failed from want of heirs, the land resulted back, or reverted to the grantor or lord of the fee from whom it proceeded, or to his decendants or successors. The escheat was originally called the reversion (*Burgess* v. *Wheat*, 1 Wm. Black. 133); it was so called in the time of Bracton. (Cruise, tit. 30, § 8.) It was the sole foundation on which rested the right of a grantor in fee, to restrain the alienation by his grantee. The grantee, during the whole period from the conquest down to the 18th of Edward I., when the statute of *quia emptores* was passed, could not alien his land, without the license or consent of the lord, who was the owner of his reversionary interest.

For reasons unnecessary here to be stated, but which may be found in 2 Bl. Com. 91, and which are recited in the preamble of the statute of *quia emptores*, that statute was enacted. It was thereby provided, "that from henceforth it shall be lawful for any freeman to sell, at his own pleasure, his lands and tenements, or part of them, so that the feoffee shall hold the same *lands and tenements of the chief lord of the same fee, by such service and customs as the [ * 500 feoffee held before."

The effect of this statute is obvious. By declaring that

every freeman might sell his lands, at his own pleasure, it removed the feudal restraint which prevented the tenant from selling his land, without the license of his grantor, who was his feudal lord. This was a restraint imposed by the feudal law, and was not created by express contract in the deed of conveyance; it was abolished by this clause in the statute. By changing the tenure from the immediate to the superior lord, it took away the reversion from the immediate lord; in other words, from the grantor, and thus deprived him of the power of imposing the same restraint, by contract or condition expressed in the deed of conveyance. The grantor's right to restrain alienation immediately ceased, when the statute put an end to the feudal relation between him and his grantee; and no instance of the exercise of that right, in England, since the statute was passed, has been shown, or can be found, except in the case of the king, whose tenure was not affected by the statute, and to whom, therefore, it did not apply.

The reason given by Lord Coke, why a condition that the grantee shall not alien, is void, is as follows: "For it is absurd and repugnant to reason, that he that hath no possibility to have the land revert to him, should restrain his feoffee of all his power to alien. And so it is, if a man be possessed of a term for years, or of a horse, or any other chattel, real or personal, and give or sell his whole interest or property therein, upon condition that the donee or vendee shall not alienate the same, the condition is void, because his whole interest and property is out of him, *so as that he hath no possibility of reverter;* and it is against trade and traffic, and bargaining between man and man." "A man, before the statute of *quia emptores*, might have made feoffment in fee, and added further, that if he or his heirs did alien without license, that he should pay a fine, then this had been good; and so, it is said, that then the lord might have restrained the alienation of his tenant, by condition,

because *the lord had a possibility of reverter. [ * 501
And so it is, in the king's case, at this day, be-
cause he may reserve a tenure to himself." (Co. Litt. 223
*a, b.*)   The same distinction between restraints of aliena-
tion, by a common person, and by the king, is stated in
the Touchstone, p. 130.   After stating, as heretofore
quoted, that conditions to pay a fine upon alienation are
void, in the case of a common person, it is added, "but,
in case of the king, such conditions are good, since, in
construction of law, the king is the donor, and has a
possibility of reverter."

The following propositions are clearly deducible from
these authorities.

1. That conditions in restraint of alienation are of
feudal origin, and depended on feudal tenure.   They
were good, wherever the grantor had the escheat or
reversion.

2. That they were good, before the statute of *quia
emptores*, because the grantor, at that time, was the feudal
lord, and had the reversion.

3. That, since the statute, they are bad, because the
escheat or reversion was thereby taken away from the
grantor.

4. That they are good, in case of the king, since the
statute as before, because the statute does not take the
escheat from the crown.

5. That the possibility of reverter, spoken of by Lord
Coke, is the right to the escheat, and nothing more nor
less.

The absence of all authority, in England, in support
of conditions like that now in question, from the time of
the passing of the statute of *quia emptores* to this day, in
all estates of inheritance, whether rent be reserved or
not, is a strong confirmation of the truth of these propo-
sitions; and it fully warrants the conclusion, that nothing
but a reversion remaining in the grantor will make such
a condition valid.

One more observation however, remains to be made, in relation to the law in England, before we proceed to examine whether the law in this state differs from it, or is in conformity with it. It is this: that the statute of *quia emptores*, in England, applied *to, and operated upon, leases in fee, or fee-farm lands. For this we have the authority of Lord Coke, in these words: "and this act (the statute of *quia emptores*) extended to lands holden by fee-farm." (2 Inst. 501.) No doubt, therefore, can be entertained, that the seignory and escheat of lands so holden, were transferred by that statute, from the grantor to the chief lord of the fee; and that by its operation, such lands were freed from restraints upon alienation, in the same way, and to the same extent, as lands conveyed in fee, without reserving rents.

We now come to the inquiry, whether the law in this colony, before the revolution, differed from the law of England; and if it did, whether the statutes of this state, passed shortly after its new political organization, produced any, and what change in it, with reference to the question in controversy.

The original patent or grant to Killian Van Rensselaer, under which the lands in question are said to be held, was not given in evidence, and is not made a part of this case. It is, probably, not material to either party, that it should have been introduced. It is said, that the statute of *quia emptores* was not in force within the colony of New York, before the revolution. In *Jackson* v. *Schutz* (18 Johns. 179), the late Mr. Emott, in his argument in favor of the validity of the tenth sales, insisted that the statute of *quia emptores* was never in force in this state, and Chief Justice SPENCER said, it was never supposed that it existed here. The colonial goverment acted upon the supposition, that it did not extend to the colony. It is well known, that a number of colonial grants were made (and the patent to Killian

Van Rensselaer is said to be among the number), by which manors were created within the province; and the patentees were authorized to grant lands within those manors, to be holden of them and their heirs, as immediate lords, to whom, by the feudal tenures thus created, fealty was due, and who were entitled to the reversions or escheats, in the same manner as the mesne lords in England were, before the statute of *quia emptores.* These manorial tenures could not have been created, if that statute had extended to the province. (2 Bl. Com. 92.) Our *statute of tenures of the 20th of February 1787 (1 Rev. Laws 70), seems [ * 503 to recognise the existence of these manorial tenures within this state. The fifth section saves to the mesne lords the fealty and feudal services due to them on conveyances made before the 4th of July 1776. We shall, therefore, assume, without further examination, that the statute of *quia emptores* was not in force within the colony; not only because this assumption is in conformity with the action and understanding of the colonial government, but because it is most favorable to the validity of the restraints on alienation claimed by the plaintiffs.[3]

Indeed, it follows from this assumption as a necessary consequence, that the restraints on alienation in grants in fee, made in the colony before the revolution, were valid, as they were in England, before the reign of Edward I. The immediate lord or grantor was entitled to the feudal services incident to tenure in socage, and to the reversion or escheat on which the right to restrain alienation depended. But this was entirely changed by the statute of this state, passed the 22d of October 1779, in connection with the statute of tenures, passed in 1787. Both these statutes took effect retrospectively, and operated upon all lands and tenures held under colonial

[3] *But see* Van Rensselaer *v.* Hays, 19 N. Y. 68.

grants, the one from the 9th, and the other from the 4th of July 1776. They operated, therefore, upon the lease in question, as if they had been passed at the time to which they related. The 14th section of the statute of 1779, is as follows: "The absolute property of all messuages, lands, tenements and hereditaments, and of all rents, royalties, franchises, prerogatives, privileges, *escheats*, forfeitures, debts, dues, duties and services, by whatsoever names, respectively, the same are called and known in the law; and all right and title to the same, which next and immediately before the 9th day of July, in the year 1776, did vest in or belong, or was or were due, to the crown of Great Britain, be, and the same and each of them, hereby are declared to be, and ever since the said 9th day of July, in the year of our Lord 1776, to have been, and for ever hereafter shall be, vested in the People of this State, in whom the sovereignty and seignority *thereof are and were united and *504 ] vested, on and from the said 9th day of July, in the year of our Lord 1776." (1 Jones & Varick 44.)

The first section of the statute of *tenures* (1 Rev. Laws 70) is substantially a transcript of the statute of *quia emptores*. The second section abolished military tenures, and all their incidents, from the 30th of August 1664, when the province was surrendered by the Dutch to the English. It also abolished all tenure *in socage, in capite*, with all its fruits and consequences. The third section converted all manorial and other tenures into free and common socage. The fourth section requires all convey-ances and devises of any manors, lands, &c., theretofore made, to be expounded as if the said manors, lands, &c., had been held, from the beginning, in free and common socage only. The fifth section declares, that the act shall not be construed to take away the rents and services due to tenure in free and common socage from the person previously entitled to them, nor the fealty or distresses incident to that tenure. The third and fourth sections

of this statute render it entirely immaterial to know, what was the tenure under which the land in question was originally held by the patentees; whatever else it may have been, it was converted by the statute into free and common socage. It was held of the crown, until the revolution, and the crown was, until then, entitled to the escheat of all the lands remaining in the hands of the patentee and his heirs, at that time.

The statute of 1779 transferred the seignory and escheat to the People of this State, who then became the chief lords of the fee. As to lands granted in fee by the proprietors of the patent, before the revolution, the escheat became afterwards vested in the people of the state, by the operation of the statute of tenures, as soon as they changed hands by conveyance in fee, if not immediately upon the passing of the act.

These statutes performed the same functions, and wrought the same changes in the feudal tenures of this state, as the statute of *quia emptores* did in England. They put an end to all feudal tenure between one citizen and another, and substituted *in its place a tenure between each landholder and the people [ * 505 in their sovereign capacity. They converted all rents upon leases in fee, from rent-service, into rent-charges, or rent *seck;* and by taking away the grantor's reversion or escheat, they removed the entire foundation on which the power of a grantor to restrain alienation by his grantee formerly rested; and they placed the law of this state, in respect to the question in controversy, on the same footing on which the law of England now stands and has stood since the reign of Edward I.[4]

The effect of these statutes upon the question in controversy being indirect and consequential, may not have been observed or understood, at the time, by the landholders, or the scriveners who drew their leases. The

---

[4] Van Rensselaer *v.* Dennison, 35 N. Y. 393.

legality of these restraints on alienation in leases in fee, before the revolution, and their legality in leases for lives and years, before and after that period, may have led, and, most probably, did lead, to their continuance in leases in fee, after that change in the government, and the enactment of the statutes referred to. But after a careful examination of the grounds on which these restraints on alienations in fee were originally sustained in England; of the change in the law there by statute, nearly 600 years ago; of the mode in which that change was wrought; and finding that the same change has taken place here by our own statutes, we cannot entertain a doubt, that the condition to pay sale-money on leases in fee, is repugnant to the estate granted, and, therefore, void in law.

It was contended on the argument, that the reservation of rent upon the conveyance in question, distinguished this case, in reference to the validity of the condition in restraint of alienation, from the case of a conveyance in fee, without rent; and that the lessor, by reserving rent, retained an interest in the land, which made the condition to pay sale-money valid. We think, a sufficient answer has been already given to this proposition, upon the authority of Lord Coke, that the statute which changed the law of England, and made these conditions unlawful, applied as well to conveyances in fee, where rent is reserved, as to conveyances, where it is not. But a further answer is, that *a rent is *506 ] not a reversion, or a possibility of reversion, and that nothing but such a reversionary interest in the land has ever been held to authorize a condition against alienation. Admitting, that the rent and the land are parts of the same estate, they are not only capable of ownership by different persons, but in their nature, they must belong to different persons. The grantor owns the rent, and the grantee owns the land; each has an estate of inheritance in his own part; the

right of alienation is inseparably incident to the estate of each; it is annexed to the inheritable quality of that estate. The power of the lessor to alien his rent cannot be restrained. "If a man be seised (says Coke) of a seignory, *a rent*, or an advowson, or any other inheritance that lyeth in grant, and by deed granteth the same to a man and his heirs, upon condition that he shall not alien, this condition is void." (Co. Litt. 223 *a*.) By the old feudal law, the tenant could not alien his fee, without the lord's license; and the lord could not alien his seignory, without the tenant's attornment. While the tenures were military, the lord had an interest in having a brave and loyal tenant, true to his oath of fidelity, and capable of rendering military service for his lands; and the tenant, on the other hand, was interested in living under the protection of the military chief of his own choice and adoption. The feudal restraint was mutual; but when the feudal relation between the parties was broken up, these feudal restraints were thereby dissolved; and the common-law principle applicable to property not feudal, immediately took effect, and rendered similar restraints created by contract entirely void.

The right of re-entry for non-payment of rent, or the non-performance of other covenants, is not such an interest in the estate as makes the condition in question valid. It is not a reversion, nor is it the possibility of reversion, nor is it any estate in the land; it is a mere right or chose in action, and if enforced, the grantor would be in, by the forfeiture of a condition, and not by a reverter. At common law, a right of entry being a mere right of action, could not be granted over. (Co. Litt. *214; 2 Cruise, tit. 18, c. 1, § 15.) It is only by statute, that the assignee of the lessor can re- [ * 507 enter for condition broken. But the statute only authorized the transfer of the right, and did not convert it into a reversionary interest, nor into any other *estate*. It is a

totally different interest from the possibility of reverter spoken of by Coke, and in the Touchstone; it is no more than the possibility of a forfeiture. When property is held on condition, all the attributes and incidents of absolute property belong to it, until the condition be broken; and this is especially true, when, as in this case, the person entitled to the benefit of the condition, is not in any degree affected in his right, under the condition, by the exercise and enjoyment of those attributes and incidents. The lessor's right of entry for breach of the lawful conditions, are not defeated or impaired, by the sale of the lessee's interest in the land.

It was also said on the argument, that the quarter-sale money, being reserved in the lease, was not the money of the lessee, but the money of the purchaser who buys from the lessee. If there be any force in this objection, it must rest on the ground that the reservation takes nothing from the pocket of the tenant, and is, therefore, no injury to him. But this is clearly a mistake. We have already seen, that the grant in fee carries with it the *inseparable* right of alienation, and the reservation is an attempt to separate from the thing granted, an incident or quality which cannot be detached from it. Rent is separable from the ownership in fee of the land; but the right of alienation is not. The reservation of rent does not affect the alienation of the tenant's interest in the land. The reservation of the sale-money restrains, and may destroy it. Besides, the reservation is an attempt to take from the tenant, not only a part of the price of the land, but a part of the price of all the buildings and other improvements he may have put on it, which may be even more valuable than the land itself; these never belonged to the lessor. The obvious effect of a reservation of quarter-sales, if valid, is, to discourage and prevent the tenant from making these improvements, because, in case a change in his circumstances

*should make it necessary to sell his farm, one quarter of the value of the improvements would go to his lessor. Moreover, if the reasoning of the plaintiff's counsel sustains his proposition, it proves too much; it will sustain the proposition, that a like reservation is good, in a grant in fee, without rent; and for this no one will contend. The reservation of sale-money must stand on the same footing, and be liable to the same objection, as the condition to pay it to the grantor. If the one restrains alienation, the other does the same thing; if one is repugnant to the estate granted, the other is equally so.

The condition in restraint of alienation cannot be sustained, on the ground that it may be useful to protect the lessor's interest in the rent. The covenant of the lessee to pay, which runs with the land, and the lessor's right to re-enter for non-payment, are practically a sufficient security for the rent. But if they were not, it could make no difference; the lessor, when he parted with the fee of the land, parted with his right to control the lessee's disposal of it. The rent, and the right to re-enter for non-payment, are not reversionary, whatever they may be called in the lease; and it is not enough, to say that they resemble, or are analogous to such interests. The condition against waste can only be imposed by the reversioner; it is repugnant to the estate granted, except where a reversion remains with the grantor. Neither the reversion of rent nor the right of re-entry for non-payment, will uphold a condition against waste, in a lease in fee. The condition against waste would be a much more efficient protection of the landlord's interest in the rent, than the condition to pay quarter-sales; and it would be an absurdity, to uphold the latter, on this ground, where the former cannot be sustained.

The arguments above referred to in favor of the condition to pay sale-money, are founded on the proposition

6 N. Y.—30       465

that the reservation of rent, and the right of re-entry, are interests in the land, remaining in the lessor, analogous to a reversion, and equivalent thereto, for the purpose of sustaining the validity of the condition. But *509 ] there is no legal equivalent for a reversion, *for that purpose. The argument is an attempt to introduce a new reason, never heretofore regarded as sufficient for supporting the condition. The reasoning from analogy is still more frail and feeble; it is only on grounds strictly technical, that the escheat, or any other remote reversion is made to sustain the condition, and nothing but a reversion, or the possibility of a reversion, is included within that technical rule. A further examination of the force and weight of the reasons in favor of the condition, derived from supposed analogies and equivalents, would open a wide field of argument upon the general tendency of these restraints upon the transfer of property, on which we think it unnecessary to enter, and, therefore, forbear to do so.

Our intention has been to investigate and decide this question, on strict legal authority, without adverting to any general considerations of public policy. We have examined it with great care, and feel assured of the soundness of the conclusions to which the examination has brought us. The case was most ably and learnedly argued; and this seemed to render it proper to state the grounds of our decision at greater length, than would otherwise have been thought necessary. The judgment of the supreme court ought to be affirmed.

Judgment affirmed.